BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
RANDALL LEONARD (FLBN 0056205)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Frank.Riebli@usdoj.gov
    Randall.Leonard@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 88-021 SI |
| | Case No. CR 17-490 SI |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| PEYTON EIDSON, a/k/a "Patton Erwin Eidson," | |
| | Date: April 27, 2018 |
| Defendant. | Time: 11:00 a.m. |

## I.     INTRODUCTION

Peyton EIDSON imported thousands of pounds of marijuana into the United States in the mid-80s. He then fraudulently obtained a U.S. passport and fled the country to evade prosecution for his drug trafficking crimes. He remained abroad, living under a false name, beyond the reach of U.S. law enforcement, from 1985 to 2011. During that period, almost all of his co-conspirators were caught and convicted. Several went to prison. EIDSON was finally returned to the United States in 2017. On January 8, 2018, EIDSON pleaded guilty to conspiring to distribute marijuana, as alleged in Count Two of CR 88-021 SI, and to aggravated identity theft, as alleged in Count Five of CR 17-490 SI. Probation recommends that the Court sentence him to a total of four years in prison: two years on each case, run consecutively. The government recommends a total of 8 years: 6 years for the drug crime and 2 years, consecutive, for the aggravated identity theft, because EIDSON was an organizer in a large-scale, international drug-smuggling conspiracy.

## II.    FACTS

### A.     EIDSON's Involvement in Drug Trafficking.

EIDSON was an international drug smuggler in the "Miami Vice" days of open-collared shirts and suitcases full of cash. See Exh. 1.[1] EIDSON helped gather investors in the United States and then traveled to Thailand with their money to arrange for large loads of marijuana, which EIDSON's organization transported to the United States aboard an ocean-going freighter called the "Christina M." Pre-Sentence Report ("PSR") ¶ 11. The Christina M. was a Panamanian-flagged, ocean-going freighter capable of carrying up to 40,000 pounds of marijuana.[2] See Exh. 2.

EIDSON arranged one such load in early 1985. According to testimony during the 1988 trial of

---

[1]    The photograph depicts EIDSON, on the left, along with co-defendants Ivan Arbogast (second from left) and Kenneth Washburn (far right). As the exhibit tag in the lower right corner indicates, this photo was an exhibit at the trial of defendants Rick Kienzel, Ivan Arbogast, George Dapsevicius, John Larsen and Sandy Harlan. The photo is still in its original exhibit sleeve – thus the reflections apparent in the image. The government asks the Court to take judicial notice of Exhibit 1, as that Exhibit was entered into the Court's record during trial in CR 88-021 RHS in November 23, 1988.

[2]    The images in Exhibit 2 are stills taken from a video of the seizure of the Christina M in the ocean south east of Hawaii on February 19, 1988. At the time of that seizure, the Christina M had over 20,000 pounds of marijuana on board. She had already offloaded approximately 20,000 pounds to smaller boats, one of which was operated by U.S. Customs agents acting undercover.

five of EIDSON's co-defendants, the conspiracy worked as follows:

> Q. What did Mr. Eidson tell you about how the load was going to be arranged for?
>
> A. Well, they were going to either purchase or lease a freighter out of Panama.
>
> Q. When you say, "they" . . .
>
> A. I mean Mr. Eidson and Mr. Washburn. And as a matter of fact, Peyton went to Panama to make these arrangements.
>
> Q. How do you know that?
>
> A. He told me. Mr. Eidson told me.
>
> Q. All right. And what arrangements did he go to Panama for?
>
> A. To arrange for a freighter and several hundreds or thousands of gallons of diesel.
>
> Q. And was that freighter going to be used in the marijuana operation?
>
> A. Yes, ma'am.
>
> Q. How?
>
> A. To load – to bring all the marijuana to a designated area in the ocean and then they would switch it into smaller boats.
>
> * * *
>
> Q. Did Mr. Eidson tell you how they were financing this load?
>
> A. He told me they had several financiers.
>
> Q. Did –
>
> A. Including himself.
>
> Q. Including himself?
>
> A. Yes, ma'am.

See United States v. Peyton Eidson, et al, CR 88-021 RHS, Trial Transcript Vol. 8 (11/23/88) at 1256-58 (excerpts of which are attached hereto as Exh. 3).

In March, EIDSON (and possibly his daughter) flew from Santa Barbara, through San Francisco and Seattle, to Bangkok, to arrange for the purchase of at least 6,674 pounds of marijuana. PSR ¶ 11; Exh. 4. Investor and co-conspirator Joseph Sazenski went along, PSR ¶ 11, and according to documents agents later seized from EIDSON, co-conspirator John Larson joined them, see Exh. 5 (showing

GOV'T SENTENCING MEMORANDUM  3
CR 88-021 SI, CR 17-490 SI

identical flights from Singapore to Jakarta and back for both EIDSON and Larson). EIDSON returned to the United States at the end of June or early July, and the marijuana from the Christina M arrived shortly after that. EIDSON's co-conspirators transferred some portion of that load to a property in Kelseyville, where they sorted, weighed and inventoried the drugs:

> Q. Did you keep any records of the marijuana during the sorting process?
>
> A. Yes, ma'am, I did.
>
> Q. What was that?
>
> A. I kept a record for Mr. Eidson, because I knew when Mr. Eidson got out of the hospital that he would want to know exactly what was there. Not what Mr. Washburn thought was there.
>
> * * *
>
> Q. Were there any other ledgers made or any other lists made of the packages aside from the one that you did during the processing?
>
> A. Yes. There was two master sheets. Actually, there were three copies of the two. On the master sheets, it would say package number, the weight and what box it's in.
>
> The Court. For each package?
>
> A. Yep. It's a ledger with several pages. Package number would be in one column. The weights would be in the next. Then the three or four packages in the box would be outlined and the box number would be there.
>
> Q. Who had those ledgers, Mr. XXXXXXX?
>
> A. Mr. Washburn made them up the day after we processed this. And he brought them. One of them he kept and one of them for Mr. Eidson and he gave me one to leave with the merchandise.
>
> Q. Did you see those ledger[s] with Mr. Eidson?
>
> A. Yes, ma'am.

Trial Transcript Vol. 8 at 1283-84, 1288-89. EIDSON used this inventory ledger to track exactly which drugs went to each purchaser. PSR ¶ 11.

On August 8, 1985, agents arrested EIDSON and several other co-conspirators, and seized numerous items from EIDSON, including: travel documents showing his travel to Asia, as well as John Larson's travel, see Exs. 4-5; the inventory ledgers described above, see, e.g., Ex. 6; pay-owe sheets, see Ex. 7; a Telex regarding repairs for the Christina M, see Ex. 8; a photo of EIDSON and at least two of his co-conspirators, see Exh. 1; and his passport. PSR ¶ 12. The agents also seized over 2,000 pounds of marijuana. The drug ledgers contained a numbering system that corresponded to markings on the boxes of drugs. EIDSON posted bail the next day and immediately began preparing his escape.

### B. EIDSON's Flight to Evade Prosecution, Using Fraudulent Travel Documents.

On September 18, 1985, EIDSON went to a passport office in Los Angeles, reported that he had lost his previous passport, and requested a replacement passport. In his application, he reported that he had "left briefcase in taxi cab in San Francisco, on Aug 9, 1985, did not know cab # waited three days, was not turned in." PSR ¶ 12; Ex. 9. This was a lie – his previous passport has been seized during the arrest. The State Department did not issue EIDSON a passport because law enforcement had placed an alert on his file to prevent just this sort of attempt to flee.

EIDSON therefore went to Texas and applied for a passport in a different name. On December 9, 1985, EIDSON and his wife submitted passport applications in the names "Michael and Anita McGoldrick."[3] PSR ¶ 12; Ex. 10. The Eidsons submitted these applications from a post office in San Antonio, Texas. The applications bore EIDSON's and his wife's photographs, but the identifying information (dates of birth and social security numbers, among other things) for the real Michael and Anita McGoldrick. Not realizing that these applications were fraudulent, the State Department issued passports to EIDSON and his wife in the names "Michael and Anita McGoldrick." Id. Soon after, EIDSON and his family left the United States.

The conspiracy continued to operate, and according to cooperators, EIDSON continued to participate from overseas, especially after his co-defendant Kenneth Washburn was arrested and jailed in Thailand in 1987. The group attempted another load in early 1988 – this time, over 40,000 pounds of marijuana, again transported on the Christina M. The Christina M brought her illicit cargo to a point in

---

[3] The real Michael and Anita McGoldrick are now deceased. Michael McGoldrick died on January 25, 1999 in Reno, Nevada. Anita McGoldrick died on September 25, 2009, also in Reno.

GOV'T SENTENCING MEMORANDUM     5
CR 88-021 SI, CR 17-490 SI

the ocean southeast of Hawaii and began offloading it to smaller boats for transport into small, unguarded harbors on the Central California coast.  See United States v. Aikins, 946 F.2d 608, 611 (9th Cir. 1990).  U.S. Customs agents, acting undercover, operated one offload boat and received over 14,000 pounds of marijuana from the Christina M on February 16, 1988.  Aikins, 946 F.2d at 611.  The Coast Guard seized another offload boat, the "Eagle B," about 750 miles west of the Golden Gate.  The Eagle B had at least 4,000 pounds of marijuana on board.  She sank while under tow back to the San Francisco Bay.  Finally, on February 19, 1988, a Coast Guard cutter and a U.S. Navy destroyer intercepted the Christina M. and seized approximately 21,000 pounds of marijuana from her.  Aikins, 946 F.2d at 611.  She had no other cargo.

EIDSON and his family apparently settled in a rural area in Northern Australia some time in 1986.  EIDSON maintained his identity as "Michael McGoldrick."  Thus, on May 19, 1995, he applied to renew the "McGoldrick" passport.  PSR ¶ 12; Ex. 11.  EIDSON submitted this application through the U.S. Consulate in Brisbane, Australia.  Once again, EIDSON attached his own photograph to an application that contained the name and identifying information of the real Michael McGoldrick.  When EIDSON signed this application, he declared that "the statements made in this application are true and complete to the best of my knowledge and belief, and the attached photographs are a true likeness of me."  This declaration was false.  The State Department granted this application and issued EIDSON a renewed passport in the name "Michael McGoldrick."  PSR ¶ 12.

He renewed the passport again in 2005.  Id.; Ex. 12.  And once again, EIDSON attached his own photograph to an application that contained the name and identifying information of the real Michael McGoldrick.  Again, when EIDSON signed this application, he declared that "the statements made in this application are true and complete to the best of my knowledge and belief, and the attached photographs are a true likeness of me."  This declaration was again false.  The State Department granted this application and issued EIDSON a renewed passport in the name "Michael McGoldrick."  Id.

The State Department discovered EIDSON's identity in 2011 and sent the information to the Australian Federal Police.  PSR ¶ 13.  The AFP arrested EIDSON on June 19, 2011, for violations of Australian immigration laws (basically, for applying for visas under a false name).  Id.  EIDSON was released on bail the next day, and immediately structured $30,000 in cash transfers to bank accounts in

the United States. Id. This too was a violation of Australian law. On August 30, 2012, EIDSON pleaded guilty to 8 counts of visa fraud and one count of money laundering, and was sentenced to two years in prison, 18 months of which were suspended. Id. Despite announcing his intent to self-deport and return to answer the charges against him in the United States, EIDSON elected to remain in Australia and resisted deportation. Id. In August 2017, he finally gave up the fight, and on August 31, 2017, two Australian Federal Police officers got on a plane with him and brought him back to the United States and delivered him to the custody of the U.S. Marshals. Id.

### C. The Charges Against EIDSON.

The government charged EIDSON in three cases. The first two, CR 88-021 SI and CR 88-168 SI, relate to his participation in the marijuana importation scheme between at least 1985 and 1988. The third, CR 17-490 SI, relates to his use of fraudulent travel documents to evade prosecution between 1985 and 2011. Pursuant to a plea deal, the government allowed EIDSON to plead to one drug trafficking count in CR 88-021 SI, and one aggravated identity theft count in CR 17-490 SI.

## III. DISCUSSION

### A. The Court Should Sentence EIDSON to Six Years for His Involvement in the Drug Importation Scheme Charged in CR 88-021 SI.

EIDSON's conduct in the case charged in CR 88-021 SI pre-dates the Sentencing Guidelines. Therefore, they do not apply. See U.S.S.G. Ch. 1.A.2 ("[T]he guidelines took effect on November 1, 1987 and apply to all offenses committed on or after that date."). Instead, the Court must rely on the factors set forth in 18 U.S.C. § 3553(a) to determine a just and fair sentence. Much as it does today, in 1985 that section provided:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in

>        the most effective manner;
>    (3)  the kinds of sentences available;
>    (4)  the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set for thin the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date the defendant is sentenced;
>    (5)  any pertinent policy statement issued by the Sentencing Commission . . . that is in effect on the date the defendant is sentenced; and
>    (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a) (1985).[4]  Probation weighed these factors and concluded that a 2-year prison term on the drug count was appropriate because (a) most of EIDSON's codefendants in CR 88-021 SI received suspended sentences of 3 years, (b) his flight from justice makes it appropriate to impose what might otherwise have been a suspended 3-year term, and (c) his significant health issues warrant a 12-month downward variance to 2 years.  The government accepts Probation's reasoning, but recommends six years for the following reasons.

   First, EIDSON was an organizer in a large, sophisticated drug importation scheme that crossed international borders.  The two indictments (CR 88-021 SI and CR 88-168 SI) charged at least 22 people, including EIDSON.  Regardless whether EIDSON was a leader or supervisor of all those people, he was clearly an organizer:  he traveled to Asia to arrange for the 1985 load; he obtained the transportation vessel in Central America; he arranged for repairs to that vessel in a foreign port; and he was one of only two people who kept copies of the inventory detailing the individual packages of drugs from the 1985 load and where they went.  And the fact that he kept not only his own travel documents but also those of his co-conspirators – after they had completed their trip – suggests that he was keeping track of expenses for accounting purposes.  He was thus a central figure.

   EIDSON's role is significant because it distinguishes him from many of the other defendants who were convicted and sentenced in this case.  The evidence seized from EIDSON indicates that the conspiracy could not have operated without him.  He managed operations both in the United States and

---

[4]   Section 3553(a) contemplated that the Sentencing Commission would issue Guidelines at some point in the future, and thus included the eventual Guidelines as factors for the Court to consider in determining the defendant's sentence.  As noted above, however, when the Sentencing Commission issued its Guidelines, it expressly made them applicable only to offenses committed on or after November 1, 1987.  The conduct EIDSON admitted occurred in 1985.

overseas, and handled the complicated logistics required to get the drugs from there to here. The ledgers seized from him – and no one else – show that he, unlike his co-defendants, understood the full scope of the conspiracy, including the precise quantities of drugs, the names of the investors, the names of the customers and the quantities they purchased. As one of the architects of the conspiracy – or at least, its operations manager – EIDSON is more culpable than other participants and his conduct warrants a harsher punishment. Thus, it is not clear that EIDSON would have received a suspended sentence had he been sentenced in 1988 along with his co-conspirators.

By way of comparison, one of EIDSON's customers and co-defendants received at least 10 years following a conviction in the District of Minnesota arising out of this same drug importation scheme. EIDSON's organization supplied marijuana to Roley. John Roley was convicted of being the leader of a continuing criminal enterprise ("CCE") in Minnesota, distributing marijuana, interstate transportation in aid of racketeering, and various tax offenses. See United States v. Roley, 893 F.2d 992, 993 n.2 (8th Cir. 1990). Though it is not clear what sentence Roley received, the mandatory minimum sentence for a first CCE conviction in 1985 was 10 years. 21 U.S.C. § 848(a) (1985). And EIDSON's co-conspirators in the related case, CR 88-168 SI, similarly received lengthy sentences: Kenneth Washburn received 10 years (but given credit for 85 months he spent in prison in Thailand for the same conduct); Glenn Boisselle received 4 years; Dennis Ingham received 78 months concurrent to two other sentences he received in other districts, including a 158-month sentence in the Western District of Washington; Michael Travis received 121 months; Carlos Cantor received 120 months; Robert Singer received 96 months; and Vincent Chacon and Paul Ziegler both received 30 months. A 6-year sentence for someone in a leadership role is modest by comparison. Respect for the law commands nothing less.[5]

EIDSON presumably will argue that it's just weed, and weed is now basically legal. It's not just weed. It's international drug smuggling. And regardless whether state law purports to legalize possession and use of marijuana, it does not purport to legalize international drug smuggling. And in the mid-80s, attitudes about marijuana were much less permissive than they are now. EIDSON thus

---

[5] EIDSON's conduct is doubly offensive for someone who accepted the maritime training the Coast Guard offered him, PSR ¶ 46, and who thus swore an oath to support and defend the Constitution and bear true faith and allegiance to the same, and then organized an international drug smuggling venture using maritime shipping. He abused the specific trust the United States reposed in him.

GOV'T SENTENCING MEMORANDUM         9
CR 88-021 SI, CR 17-490 SI

willfully put himself in the middle of a conspiracy to commit what he knew were serious offenses. That's why he ran when he got caught.

Moreover, unlike many defendants the Court sees in drug cases, EIDSON was raised in a good home and received an education. PSR ¶¶ 30-31 and 43.  He consumes alcohol on occasion, but does not use drugs, not even marijuana. Id. ¶ 42.  Thus, the usual forces that impel a person to join the drug trade – poverty, neglect, abuse and addiction – are absent in this case.  For EIDSON, it was the excitement and the profit.  This too makes him less sympathetic.

Second, the government believes that no further variance is appropriate for EIDSON's health issues for at least two reasons.  To being, allowing EIDSON to rely on the health problems he has now for additional lenience gives him a benefit for evading prosecution for 32 years.  EIDSON's co-conspirators all faced lengthy prison terms during the prime years of their lives – several went to prison for a long time.  EIDSON, on the other hand, was enjoying himself as the owner and operator of a health and wellness retreat in the mountains of northeast Australia.  Had he stayed in the United States, he would not have been in a position to ask the Court for a reduced sentence because of his health problems.  Had he come back to answer for his crimes after he was discovered in 2011, he would have been in his mid-60s and presumably in better health than he is today.  But he chose not to do that.  He only appeared here after he was forced to leave Australia.  Thus it is his own fault that he is now in his mid-70s, burdened with health problems, and facing a prison term.  EIDSON chose to delay this day for 32 years.  In addition, the government has shown him considerable compassion in allowing him to plead to a charge which does not trigger a 10-year statutory minimum.  The government thus has accounted for his present condition in the manner it resolved the case and in the recommendation it now makes. EIDSON should receive no further variances on account of his current health issues.

**B.   The Court Must Impose a Three-Year Term of Special Parole.**

The statute in effect at the time EIDSON committed his offense included a requirement that the Court impose a three-year term of special parole to follow any term of imprisonment imposed.  21 U.S.C. § 841(b)(1)(B) (1985).  A special parole term is a period of supervision following imprisonment which converts to a custodial term if the parolee violates the terms of his parole.  Here then, the government asks that the Court impose a 6-year prison term followed by a 3-year period of special

parole. If EIDSON were to violate the conditions of his special parole, that 3-year term would convert to a 3-year custodial term added onto the end of his 6-year prison term. He would return to prison for three years and would not receive credit for any time he spent while out of custody on parole. 21 U.S.C. § 841(c).

### C. The Court Must Impose a Consecutive Two-Year Sentence for the Aggravated Identity Theft Charge.

There is no Guidelines calculation for the aggravated identity theft conviction. The Guideline sentence for that offense is the statutory term of imprisonment – 2 years. U.S.S.G. § 2B1.6(a). That sentence must be consecutive to any other term of imprisonment imposed. 18 U.S.C. § 1028A.

## IV. CONCLUSION

For the foregoing reasons, the government recommends that the Court impose a 6-year term of imprisonment on the drug count in CR 88-021 SI, followed by a 3-year period of special parole, and a 2-year term of imprisonment on the aggravated identity theft count in CR 17-490 SI, consecutive to any term imposed on the drug count.

DATED: April 20, 2018

Respectfully submitted,

ALEX G. TSE
Acting United States Attorney

/s/
FRANK J. RIEBLI
RANDALL LEONARD
Assistant United States Attorneys